Pathe Freres Phonograph Company owed Cozzone Company for merchandise, approximately, $20,000, evidenced by a trade acceptance of $5,000, discounted and held by a bank; a trade acceptance of $3,000, discounted by one Schencker; a trade acceptance of $3,000 in hand, and by an open book account balance of about $9,000. To induce Cozzone Company to sign a credit extension agreement, the Pathe company, then in financial difficulty and in charge of a creditor's committee, delivered to it, in part payment of the indebtedness, merchandise and machinery, equal in value to the book account, and enough to pay the $3,000 trade acceptance Cozzone Company had in hand. The exact amount in excess of the book account was $3,041.23. When the Schencker trade acceptance fell due, it was protested, and upon Schencker's threat of suit the Pathe company paid him $1,500 in cash, and gave renewals of $750 each. At the same time Cozzone *Page 42 Company surrendered the $3,000 trade acceptance in hand, on the promise, as it claims, that it was to offset by that amount the $3,041.23 balance of the merchandise item. The Pathe company shortly afterwards went into the hands of receivers, the defendants in this suit, who brought an action in the supreme court to recover the $3,041.23 on book account, to which action Cozzone Company set up that it had surrendered the $3,000 trade acceptance in hand in satisfaction of that much on the book account, and that it owed but $41.23. At the trial before Circuit Court Judge Speer, without a jury, the receivers offered in evidence this written offer, and testimony that the $3,000 trade acceptance in hand was delivered up pursuant to its terms:
"March 22d 1921.
Pathe Freres Phonograph Company and Creditors' Committee.
Dear Sirs:
I hereby offer to sell and deliver to you for cancellation your two trade acceptances for $3,000 each, coming due, respectively, on March 12th and March 19th, an aggregate amount of $6,000, in consideration of your company, notwithstanding my signing of the creditors' extension agreement, paying me $1,500 in cash and delivering me trade acceptances for $750 and for $750 coming due, respectively, on June 13th, 1921, and on September 12th, 1921, and in consideration of the creditors' committee agreeing to such payment acting through their agents.
 Yours very truly, JOHN A. COZZONE CO., JOHN A. COZZONE, Pres.
JOHN A. COZZONE [Seal] ANTONIO F. PAVIA, Treas."
Cozzone Company offered testimony that the trade acceptance in hand was delivered up for cancellation in part satisfaction, which the trial judge refused to entertain, and ordered judgment for the plaintiffs, deferring the entry until Cozzone Company could apply to this court for relief. Upon the filing of this bill, to reform the written offer, to include the contemporaneous promise of offset, action in the law suit was stayed. The testimony before me was substantially like that in the trial at law — Cozzone, the president *Page 43 
of Cozzone Company, maintaining that he surrendered the trade acceptance for cancellation upon the promise of one Bailey, the secretary of the creditors' committee, that his company was to have credit for it on the book account; and there is considerable supporting testimony that he so promised. On the other hand, Bailey insisted that there was no mention of credit during the negotiations, and explained that Cozzone, his company being financially shaky, was anxious to appease Schencker, and agreed to surrender the trade acceptance if the Pathe company would settle with Schencker and avert the threatened judgment and execution against his company, he, Bailey, having at the same time reasoned with Cozzone that if the Pathe company were forced to the wall he would probably receive but fifty cents on the dollar. He further testified that when the bargain was struck he had the lawyer of the creditors' committee prepare the written offer in New York, and that some days later he returned to Newark, paid Schencker, and, thereupon, Cozzone and Pavia, the treasurer of Cozzone Company, signed the paper and surrendered the trade acceptance. It was a story faultlessly and frankly told, but it was not appealing. It ran counter to common experience. Men do not ordinarily surrender two trade acceptances for the payment of one. At the conclusion of the testimony there was little question that Cozzone's version was true, although he admitted having read the paper before signing. His explanation is that he signed the paper "which I understood to be the cancellation of the debt owing on my books to the Pathe people," and that when he read it, "I thought it expressed my agreement with Mr. Bailey," and that he "understood that was what the sense of the agreement would be," from Mr. Bailey.
Some time after the hearing, the solicitor of the receivers came to me in chambers with the trade acceptance in hand of $3,000, which had not been produced either at the trial at law or here, and he was advised to show it to opposing counsel, and, upon motion, a rehearing was granted and the trade acceptance was offered in evidence. On the face, in the top margin, is written "canceled to offset mdse. sold." There was *Page 44 
no explanation. It had, ever since its surrender by Cozzone, been in the hands of Pathe company or the receivers. And there is no explanation of the fact that the words of cancellation on the original were not written on the copy of the trade acceptance produced before me at the first hearing. The words of cancellation, in my opinion, conclusively impugn the integrity of the written offer. Counsel for the receiver, not disputing the irrefutable conclusion of fact, nevertheless, contends that the complainant is not entitled to a reformation, because, according to the well-settled principle, "where a party attaches his signature to a contract, otherwise valid, a conclusive presumption is created, except as against fraud, that the signer read, understood and assented to its terms." Fivey v.Pennsylvania Railroad Co., 67 N.J. Law 627. And, that if it was the result of a mistake, the mistake was unilateral, on the part of the complainant, and that contracts are not reformable in equity except upon mutual mistake. Green v. Stone, 54 N.J. Eq. 387.
If the contract was the result of a unilateral mistake the remedy is by rescission. Wirsching v. Grand Lodge, F. A.M.of N.J., 67 N.J. Eq. 711. And if procured by fraud it may be reformed or altogether stricken down — rescinded. In the light of the established facts attending the execution of the disputed document there can be no reasonable doubt that Bailey, the secretary, encouraged the officer of the complainant to sign it, knowing that they were laboring under the belief that it effected a discharge of the book account. That was a fraud. And to take advantage of it is also a fraud. Black Rec. Canc. § 130, and cases cited; Scott v. Hall, 60 N.J. Eq. 451; DunstonLitho. Co. v. Borgo, 84 N.J. Law 623.
The written offer will be set aside, and if a prayer to that end is necessary it may be added to the bill. The fraud may also be charged by amendment.
Upon a rescission the status quo ante must be restored as nearly as may be. Here, there is nothing to restore. Payment by the Pathe company of the Schencker trade acceptance, which it claims was the consideration for the cancellation *Page 45 
of the trade acceptance in hand, was its bounden duty. The extension agreement did not apply to the Schencker debt because it was signed by Cozzone after he became the owner of the trade acceptance. The Pathe company gave nothing for the trade acceptance in hand.
Decree accordingly, with costs.