GREGORY A. BLAIR AND MARIE BLAIR, HIS WIFE, PLAIN-
TIFFS, v. ERIE LACKAWANNA RAILWAY COMPANY,
a/k/a ERIE LACKAWANNA RAILROAD COMPANY, P. J.
McGINLEY, W. E. SERFASS AND JOHN OLAH.
JOHN E. McCABE AND JULIANA ANN McCABE, HIS WIFE,
PLAINTIFFS, v. ERIE LACKAWANNA RAILWAY
COMPANY, a/k/a ERIE LACKAWANNA RAILROAD
COMPANY, TRAIN ENGINEER AND TRAIN CONDUCTOR,
DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided May 22, 1973.

Mr. *Stephen S. Weinstein* for all plaintiffs.

Mr. *Richard M. Icklan* for all defendants (*Messrs. Lamb, Blake, Hutchinson, Thompson & Chappell,* attorneys).

COLLINS, J. C. C., Temporarily Assigned. Plaintiff Gregory A. Blair contends that he was injured due to the negligence of defendant Erie Lackawanna Railway Company and certain of its employees. There is some indication that he may have been hurt while attempting to board a moving passenger train.

Plaintiff John E. McCabe also contends that he was injured due to the negligence of defendant Erie Lackawanna Railway Company and certain of its employees. There is some indication that McCabe may have suffered his injury while alighting from a moving passenger train.

This court has been called upon by plaintiffs in these two actions to rule upon their motions to strike certain of defendants' affirmative defenses or in the alternative to grant summary judgments. While these cases have not been consolidated for trial, the respective motions in each deal with precisely the same issue, to wit, the constitutionality of a portion of *N. J. S. A.* 48:12–152, whose provisions have been raised by the defendant in both actions, Erie Lackawanna Railway Company, as an affirmative defense. Plaintiffs, in effect, ask this court to declare the following statutory provision to be violative of our state and federal organic law and hence void and of no effect:

48:12–152. Trespassing on tracks prohibited; contributory negligence; injury on tracks or moving car; crossings.

\* \* \* \* \* \* \* \*

Any person injured by an engine or car while walking, standing or playing on a railroad or by jumping on or off a car while in motion shall be deemed to have contributed to the injury sustained and shall not recover therefor any damages from the company owning or operating the railroad. \* \* \*.

■ ■ Whenever one challenges the constitutional validity of a legislative enactment he undertakes a formidable task, and rightly so, for he is challenging the collective judgment of the .elected representatives. of the people. A court called upon to measure the validity of such an assault is, in its turn, functioning in one of the most delicate areas of jurisprudence, where it must constantly keep in mind the necessity to interfere as little as possible with the performance of constitutionally charged duties by a coequal branch of government while concurrently meeting its responsibility to safeguard the rights of the individual and to insure adherence by all to the requirements of our State and Federal Constitutions.

The doctrine of separation of powers is a fundamental principle of American government, expressly provided for in the constitutions of many states, and implied in almost all the others and in the Federal government from the creation of the three separate branches of government. See *Annot.* 69 *A. L. R.* 266 (1930) ; *Annot.* 89 *A. L. R.* 1113 (1934). * * *

\* \* \* \* \* \* \* \*

The doctrine of separation of powers must therefore be viewed not as an end in itself, but as a general principle intended to be applied so as to maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent the concentration of *unchecked* power in the hands of any one branch. * * * [*David v. Vesta Co.*, 45 *N. J.* 301, 315–326 (1965)]

It is well to repeat that while the doctrine of separation of powers is designed to prevent a single branch from claiming or receiving inordinate power, there is no bar to cooperative action among the branches of government. *On the contrary, the doctrine necessarily assumes the branches will coordinate to the end that government will fulfill its mission. In re Zicarelli* [*Zicarelli v. New Jersey State Comm. of Investigation*] 55 *N. J.* 249, 264–265 (1970), affirmed 406 *U. S.* 472, 92 *S. Ct.* 1670, 32 *L. Ed.* 2d 234 (1972). * * *. [*Brown v. Heymann*, 62 *N. J.* 1, 11 (1972) ; emphasis added]

In order to implement the principles noted above our courts have developed certain presumptions in favor of, and imposed certain burdens upon those seeking to challenge the constitutional validity of, the enactments of our legislature.

\* \* \* There is a strong presumption that a statute is constitutional, *General Electric Co. v. City of Passaic*, 28 *N. J.* 499, 510 (1958); *In re Village of Loch Arbour*, 25 *N. J.* 258, 264–265 (1957), and a legislative act will not be declared void unless its repugnancy to the constitution is clear beyond a reasonable doubt. *Gangemi v. Berry*, 25 *N. J.* 1, 10 (1957). "To declare a statute unconstitutional is a judicial power to be delicately exercised." *Wilentz v. Henrickson*, 133 *N. J. Eq.* 447, 487 (Ch. 1943), affirmed 135 *N. J. Eq.* 244 (E. & A. 1944). \* \* \* [*Harvey v. Essex County Bd. of Chosen Freeholders*, 30 *N. J.* 381, 388 (1959)]

There is a presumption [in favor] of the constitutional sufficiency of a legislative enactment; and the onus of a showing *contra* is on him who interposes the challenge. [Citations omitted]. The finding of the Legislature is presumed to have the support of facts known to it "unless facts judicially known or proved preclude that possibility"; *generally* it is "not the province of a court to hear and examine evidence for the purpose of deciding again a question which the legislature has already decided"; \* \* \*. *Clark v. Paul Gray*, 306 *U. S.* 583, 59 *S. Ct.* 744, 83 *L. Ed.* 1001 (1939). Every intendment is indulged in favor of the validity of the act. \* \* \* [*Jamouneau v. Harner*, 16 *N. J.* 500, 515 (1954), *cert. den.* 349 *U. S.* 904, 75 S. Ct. 580, 99 *L. Ed.* 1241 (1955)]

Also see *Fried v. Kervick*, 34 *N. J.* 68, 74 (1961); *Levitt & Sons v. Div. against Discrimination, etc.*, 31 *N. J.* 514, 531 (1960); *In re Loch Arbour*, 25 *N. J.* 258, 264–265 (1957); *Williams v. Smith*, 94 *N. J. Super.* 341, 346 (App. Div. 1967) aff'd 51 *N. J.* 161 (1967); *In re Freygang*, 46 *N. J. Super.* 14 (App. Div. 1957), aff'd 25 *N. J.* 357 (1957); *State v. Community Distributors, Inc.*, 123 *N. J. Super.* 589 (Monmouth Cty. Ct., decided April 23, 1973); *Kohler v. Barnes*, 123 *N. J. Super.* 69, 83 (Law Div. 1973); *N. J. Sports & Exposition Authority v. McCrane*, 119 *N. J. Super.* 457, 472–473 (Law Div. 1971), mod. on other gds., 61 *N. J.* 1 (1972).

The wisdom of the legislature of the means it selects are not subject to review or interference by the courts except in the protection of fundamental constitutional rights. *Gundaker Central Motors v. Gassert*, 23 *N. J.* 71, 81 (1956). \* \* \*. [*State v. Ulesky*, 100 *N. J. Super.* 287, 295 (Cty. Ct. 1968), rev'd on other gds. 54 *N. J.* 26 (1969)]

Cf. *Texas Co. v. Di Gaetano,* 71 *N. J. Super.* 413, 431 (App. Div. 1962).

A final caveat must be noted before we enter into an analysis of the arguments presented in this matter. This court is a trial court and hence the above noted limitations, clearly binding upon all levels of the judiciary, are, if this is possible, even more strictly to be observed by us than the courts of an appellate nature.

In *Legg v. County of Passaic,* 122 *N. J. L.* 100, 4 *A.* 2d 300 (Sup. Ct. 1939), Mr. Justice Parker quoted with approval from an opinion of Judge Dungan, that "the better practice is for the inferior court to assume that an act is constitutional until it has been passed by the Appellate Court, unless it is so clearly in contravention of the constitution that there can be no reasonable doubt about it, * * *."
It is clear that it is not the function of this court to pioneer in the field of constitutional law. The presumption of constitutionality must be applied with greater force here than in the appellate courts. The pattern of the law must be drawn by the appellate courts. The trial courts, especially those of limited jurisdiction, must follow, not lead. [*Neeld v. Automotive Products Credit Ass'n,* 21 *N. J. Super.* 159, 161 (Cty. D. Ct. 1952)]

Cf. *State v. Cannarozzi,* 77 *N. J. Super.* 236, 239 (App. Div. 1962).

Defendant initially puts forward the proposition that the case of *Egan v. Erie R. R. Co.,* 29 *N. J.* 243 (1959), is dispositive of the question of the constitutionality of the statutory provision before the court. With this the court cannot agree.

*Egan* dealt with a situation where a seven-year-old infant-trespasser fell and was injured while attempting to board a moving freight train. The analysis of the court was based upon the premise that "the effect of the statute is to absolve a railroad company from a duty to a trespasser." 29 *N. J.* 248. The court held the statute constitutional as applied to infant trespassers.

Considering the importance of railroads as an instrument of transportation and commerce, the enormous territory encompassed by their rights of way, and the practical impossibility of adequately fencing

or guarding them against trespassers, we cannot say that legislation relieving them from liability to trespassers while not so relieving other landowners is arbitrary or unreasonable. [at 253]

Nowhere does it appear that the court considered the question of the constitutionality of this statute as applied to paying passengers in areas reasonably subject to supervision by railroad employees. Therefore this court does not believe it is foreclosed from examining the plaintiffs' arguments. It should be emphasized, however, that our case law indicates these statutory provisions have been applied to fare-paying passengers, *although such application does not appear to have ever been examined in the context of a constitutional challenge such as the one currently before the court.* See, for example, *Kovacs v. Pennsylvania R. R. Co.,* 76 *N. J. Super.* 451 (App. Div. 1962).

■ The first argument presented by plaintiffs with which the court will deal is that *N. J. S. A.* 48:12–152 infringes upon the constitutionally mandated rule-making power of our Supreme Court.

Plaintiffs argue that the statute, by providing that where it is determined a plaintiff was injured while jumping on or off a moving train, contributory negligence is established as a matter of law, deprives the trial court of its discretion to submit issues of negligence or contributory negligence to the jury. Plaintiffs point to *George Siegler Co. v. Norton,* 8 *N. J.* 374 (1952), as indicating that such a statute, by interfering with the trial court's discretion to grant or deny a summary judgment, runs afoul of the doctrine first established in *Winberry v. Salisbury,* 5 *N. J.* 240 (1950), *cert.* den. 340 *U. S.* 877, 71 *S. Ct.* 123, 95 *L. Ed.* 638 (1950), derived from *N. J. Const.* (1947) *Art.* VI, § II, *par.* 3.

■ Plaintiffs therefore must contend that *N. J. S. A.* 48:12–152 is concerned primarily with matters of practice and procedure rather than substantive law. *Winberry v. Salisbury, supra; George Siegler Co. v. Norton, supra; New Shrewsbury v. Block 115, Lot 4,* 74 *N. J. Super.* 1, 8 (App.

Div. 1962); *State v. United States Steel Corp.*, 19 *N. J. Super.* 274 (Ch. Div. 1952), aff'd 12 *N. J.* 38 (1953).

* * * The distinction between substantive law, which defines our rights and duties, and the law of pleading and practice, through which such rights and duties are enforced in the courts, is a fundamental one that is part of the daily thinking of judges and lawyers. Substantive law includes much more than legislation, it comprehends also the rights and duties which have come down to us through the common law. * * * [*Winberry v. Salisbury, supra.*, 5 *N. J.* at 247–248]

In the *Norton* case the court dealt with a statute, *N. J. S. A.* 48:12–83, which did not simply grant or deny altogether a right to recovery, but prescribed procedurally whether the court or the jury should make the decision as to whether there should or should not be an award of damages. *N. J. S. A.* 48:12–152, as defendant's counsel has pointed out, gives "the trial judge the right to nonsuit a plaintiff or to submit the issue of contributory negligence to a jury if the circumstances dictate." *N. J. S. A.* 48:12–152 provides a standard against which a plaintiff's conduct may be measured in order to determine whether he is entitled to a recovery or not. See *Rosenberg v. North Bergen*, 61 *N. J.* 190, 199–200 (1972). *N. J. S. A.* 48:12–83, on the other hand,

* * * merely postpones any consideration by the court of the question of contributory negligence as a matter of law until after a verdict is rendered *and is wholly procedural in its application.* We therefore conclude that the statute operates within the field of our exclusive rule making power and since it prevents the entry of a judgment of dismissal at the close of the plaintiff's evidence or a judgment for the defendant at the close of all the evidence, where, under *Rule* 3:41–2 or *Rule* 3:50 such a judgment would be proper, the statute is necessarily in conflict with such rules and therefore is superseded thereby and no longer effective. [*George Siegler Co. v. Norton, supra.*, 8 *N. J.* at 382–383]

*N. J. S. A.* 48:12–152 does not similarly run afoul of the rule-making prerogative of our Supreme Court.

In conjunction with their *Winberry* argument, plaintiffs have contended that *N. J. S. A.* 48:12–152 intrudes upon the Supreme Court's power to adopt rules of evidence both under the State Constitution and *N. J. S. A.* 2A:84A–33, and that by creating an irrebuttable presumption of negligence it is in conflict with our *Evidence Rules* 13 and 14. As indicated previously, all *N. J. S. A.* 48:12–152 does is to set out a negative standard for recovery. Further, it would appear that the statute simply codifies long extant principles of our decisional law. See, for example, *Zelman v. Pennsylvania R. R. Co.*, 93 *N. J. L.* 57, 58–59 (Sup. Ct. 1919), aff'd 94 *N. J. L.* 283 (E. & A. 1920); *Kovacs v. Pennsylvania R. R. Co., supra.*, 76 *N. J. Super.* at 457.

While there is no question in this court's mind of the substantive nature of the provisions in question, it should be noted that even if there were *some* doubt, this court would be extremely wary of its assertion of the judiciary's supremacy in the field of rule-making. As Justice Jacobs indicated in his famous dissent in *State v. Otis Elevator Co.*, 12 *N. J.* 1 (1953),

> \* \* \* the doctrine of judicial supremacy in rule making ought, as a matter of comity towards the Legislature, be accompanied by fair recognition of important statutory policies in fields which are of special legislative concern. \* \* \*. Compare the famous dissenting opinion of Justice Stone (joined by Justices Brandeis and Cardozo) in *United States v. Butler*, [297 U. S. 1, 56 S. Ct. 312, 80 L. Ed. 477,] *supra.*, where he poignantly noted that while the other branches of government are always subject to judicial restraint the only check on the court's assertion and exercise of power is its "own sense of self-restraint." [at 25–26]

See also *New Shrewsbury v. Block 115, Lot 4, supra.*

It is interesting to note, with regard to the very rules of evidence allegedly interfered with by the statute in question, that they were purposely codified in both statutory and rule form so as to insure the participation of all branches of State Government, thus making moot any question of promulgating authority, and represented the combined efforts

of the judicial and legislative branches of our State Government. *New Jersey Rules of Evidence* (1972 ed.), "Preliminary Comments to the Rules," by Chief Justice Weintraub, at p. v; Vincent J. Biunno, Esq., at p. xix.

To conclude, given the presumptions earlier noted in favor of the constitutional validity of a legislative enactment, and the failure of plaintiffs to show this statute is procedural rather than substantive in nature and thus suspect under *N. J. Const.* (1947), Art. VI, § II, par. 3, plaintiffs' first argument necessarily fails.

We now turn to plaintiffs' arguments, closely interrelated, with regard to equal protection under both our State and Federal Constitutions, and our State Constitution's prohibitions against the enactment of laws of a private, special or local character.

Plaintiffs make their equal protection argument on several fronts. They contend that the singling out of railroads for the grant of a special immunity, while not granting other common carriers a similar protection, is without a rational basis. In effect, they argue that railroads may not be distinguished from other forms of public transportation insofar as the liability of such carriers to their passengers is concerned. Secondly, they argue that while the rationale of the *Egan* case, *i. e.,* the inability of a railroad to police every yard of its right of way, indicates a rational basis for the protection of railroads by the provisions of *N. J. S. A.* 48:12–152, this basis bears no relation to paying passengers such as plaintiffs in this case. (With this second contention the court has already indicated its agreement by not finding *Egan* to be dispositive of the issues herein raised). Thirdly, plaintiffs argue that the statute in question, insofar as it accords protection to railroads alone, has lost a basis it once may have had for the special classification accorded this form of transportation. *Cf. Fisher v. Bedminister Tp.,* 11 *N. J.* 194, 204–205 (1952). The court is urged "to reconsider 'the importance of railroads as an instrument of transportation and commerce', in light of todays' changing em-

phasis in the field of public and private transportation," see *Egan v. Erie R. R. Co., supra.,* 29 *N. J.* 253, particularly in light of the trend in the law today towards the limitation of immunities from liability. See, for example, *Willis v. Dept. of Conservation and Economic Development,* 55 *N. J.* 534 (1970); *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29 (1958).

Plaintiffs, in making the above-noted arguments, have raised the guarantees of both the New Jersey and Federal Constitutions. While many of our courts appear to have believed that the analysis to be conducted under these two concepts is the same, it would appear from a recent decision of our Supreme Court that there are certain distinctions between the application of equal protection under our State Constitution and that of the principle under the 14th Amendment to the Federal Constitution. *Robinson v. Cahill,* 62 *N. J.* 473 (1973).

Judge Botter, in one of several opinions he was called upon to write with regard to a constitutional challenge to the system of financing for our public schools, was asked to determine where in our State Constitution the right to equal protection of the laws resides:

* * * In *Robinson v. Cahill,* 118 *N. J. Super.* 223, 270–271 (Law Div. 1972); *Washington National Ins. Co. v. Board of Review,* 1 *N. J.* 545, 553–554 (1949), was cited for the proposition that the right to equal protection resides in Art. I, par. 1 of our State Constitution. This view would appear to have been cited with approval in *Bailey v. Engelman,* 56 *N. J.* 54, 55 (1970). While the phrase "equal protection of the laws" is not used in the New Jersey Constitution, concepts of equality comparable to the rights of equal protection under the Fourteenth Amendment are derived from a number of provisions of our State Constitution. In *General Public Loan Corp. v. Director, Div. of Taxation,* 13 *N. J.* 393, 401 (1953), reference is made to Art. I, par. 1, and Art. IV, § 7, pars. 7, 8 and 9, as the "group of constitutional provisions * * * adverted to as the 'equal protection' clauses." See also *Robson v. Rodriguez,* 26 *N. J.* 517, 526 (1958), where the court said that the "test of whether a law constitutes special legislation is essentially the same as that which determines whether it affords equal protection of the laws." See also *Alfred Vail Mutual Ass'n. v. Borough of Shrewsbury,* 58 *N. J.* 40, 52 (1971),

where the court, in dealing with the reasonableness of classifications for legislative purposes, emphasized the requirement that the legislature act "by general laws" contained in the concluding paragraph of Art. IV, § 7, par. 9.

Although my January 19 opinion dealt with equal protection rights, the concept that legislation must not be arbitrary and cannot contain unreasonable classifications, unnecessary or unrelated to appropriate legislative purposes, may also be expressed in terms of due process rights. See *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 32 *N. J.* 55, 70 (1960) ; *Reingold v. Harper*, 6 *N. J.* 182, 190–194 (1951).

My purpose here is simply to indicate that equal protection rights and the requirement for reasonable classifications germane to a legislative purpose are rights that are derived not only from Art. I, par. 1, but are common to other provisions of our State Constitution. It may be said that these rights find expression in our State Constitution so pervasive that they constitute the most fundamental and essential guaranty of that Constitution. * * * [*Robinson v. Cahill*, 119 *N. J. Super.* 40, 48 (Law Div. 1972), mod. 62 *N. J.* 473 (1973)]

In any case, it would appear that as our Supreme Court recently said,

The concept of equal protection antedates the Fourteenth Amendment. It is implicit in a democratic form of government. The Declaration of Independence proclaimed that "all men are created equal," which must mean equality at the hands of government. * * * [*Robinson v. Cahill*, 62 *N. J.* at 483, fn. 1]

As mentioned earlier, our Supreme Court has indicated certain differences between the application of equal protection under the Federal and State Constitutions in its decision in *Robinson*.

We go then to the question of whether our State guarantee of equal protection is offended. In preparing this opinion before the decision in *Rodriguez* [*San Antonio Independent School District v. Rodriguez*, 411 *U. S.* 1, 93 *S. Ct.* 1278, 36 *L. Ed.* 2d 16 (1973)] we considered both the federal and state equal protection issues in terms of the compelling state interest doctrine, because the doctrine could not be ignored on the federal issue and because the parties presented the State constitutional issue on the same terms. * * *. *We should not be understood, because of our treatment of the State equal protection issue in those terms, to embrace that doctrine in the application of the State equal protection issue.*

In passing we note briefly the reason why we are not prepared to accept that concept for State constitutional purposes. We have no difficulty with the thought that a discrimination which may have an invidious base is "suspect" and will be examined closely. And if a discrimination of that kind is found, the inquiry may well end, for it is not likely that a state interest could sustain such a discrimination. But we have not found helpful the concept of a "fundamental" right. No one has successfully defined the term for this purpose. Even the proposition discussed in *Rodriguez*, that a right is "fundamental" if it is explicitly or implicitly guaranteed in the Constitution, is immediately vulnerable, *for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment.* And if a right is somehow found to be "fundamental" there remains the question as to what State interest is "compelling" and there, too, we find little, if any, light. *Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary.* In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. * * * [*Robinson v. Cahill*, 62 *N. J.* at 491–492; emphasis added]

On the basis of the arguments presented in the instant case, there has been no indication of an allegation of classification on the basis of suspect criteria, such as race or wealth, nor of the violation of a "fundamental" right, in the sense indicated in *Robinson, supra*. Therefore, this court feels secure in treating both the federal and state equal protection issues in the same manner and thus the following analysis is to be considered as applicable to both. This court will, of course, avoid the mechanical approach abhorred in *Robinson*. However, it is apparent that we should still make use of those principles of statutory construction and constitutional law previously developed by our courts for use in the area of equal protection in order to determine whether the restraint imposed by *N. J. S. A.* 48:12–152 (which, incidentally, as the statute appears only to codify existing principles of our substantive law, may in any case be superfluous), balanced against the justification for it, indicates

the Legislature's enaction of the statute was arbitrary and its continued enforcement violative of our organic law.

The general presumptions and burdens noted at the beginning of this opinion are joined by others of a like character, particularly tailored to be used in the analysis of the validity of classifications adopted by the Legislature in the light of the requirements of equal protection.

The rules for judicial review of a legislative classification which is challenged as a denial of equal protection are well settled. The equal protection clause of the Fourteenth Amendment does not deprive the State of the power to classify in the adoption of police laws, but allows wide discretion, precluding only that done without any reasonable basis and therefore purely arbitrary. The constitutionality of a legislative classification is presumed and one who assails the classification must carry the burden of showing its arbitrariness. A classification having some reasonable basis is not invalid merely because it is not made with mathematical nicety or because in practice it results in some inequality. And the classification must be upheld if any set of facts can reasonably be conceived to support it. In short, the equal protection clause forbids only invidious discrimination. * * *

More specifically, evils in the same field may be of different dimensions and proportions, and the reform may therefore take one step at a time, attacking the evil where it seems most acute to the legislative mind. * * * [David v. Vesta Co., supra., 45 N. J. at 314–315]

The classification satisfies the constitutional test of equality and reasonableness if it rests upon some ground of difference having a real and substantial relation to the basic object of the legislation or some relevant consideration of public policy. Even though the distinction be narrow, it suffices if it is reasonably concerned with the end legitimately in view. Ring v. Mayor and Council of Borough of North Arlington, 136 N. J. L. 494 (Sup. Ct. 1948), affirmed 1 N. J. 24 (1948). * * *

Arbitrary selection can never be justified by terming it classification. Classification must itself be fair and impartial and not arbitrary or illusory, grounded in material distinctions and differences concerned with the central legislative policy; and it satisfies the constitutional standard if there be any conceivable state of facts affording a just ground for the action taken * * *. If there be a reasonable distinction of circumstance there is not the oppressive inequality at odds with the equal protection principle. Washington National Insurance Co. v. Board of Review, 1 N. J. 545 (1948). [Guill v. Mayor and Council of City of Hoboken, 21 N. J. 574, 582–583 (1956) ; emphasis added]

See also Pierro v. Baxendale, 20 N. J. 17 (1955)

\* \* \* The equal protection clause of the Fourteenth Amendment secures equality of right by forbidding arbitrary discrimination between persons similarly circumstanced. Classification is consistent with this principle if it be reasonably based in the public policy to be served. It is not necessarily fatal that the classification be wanting in purely theoretical or scientific uniformity or mathematical nicety or that there be some inequality in practice. \* \* \* [*Schmidt v. Board of Adjustment of Newark*, 9 *N. J.* 405, 418 (1952)]

This court cannot agree with plaintiffs' argument that railroads cannot, for purposes of tort liability to fare-paying customers, be distinguished from other forms of public transportation. The number of passengers carried at any one time, the extent of the areas to be supervised, the need to have more than a few common entranceways onto cars, are just a few of the distinctions upon which the Legislature could have determined, and, indeed, may still determine, that the railroads should receive consideration as a special class. This court cannot say, especially in light of the *Egan* decision, written in 1959, that, given the growing crisis in both urban transportation and sources of energy for locomotion, that railroads are no longer important instruments of transportation and commerce deserving of special treatment in furtherance of public welfare. The mere fact that other modes of travel have not been accorded the same sort of statutory treatment does not invalidate the act.

\* \* \* The Legislature has a large measure of discretion in selecting the means of accomplishing its goals, and distinctions of degree will be presumed to rest upon a rational basis if there be any conceivable state of facts which would afford reasonable ground therefor. \* \* \* [*Robson v. Rodriguez*, 26 *N. J.* 517, 524 (1958)]

Further,

\* \* \* The legislative authority "is not bound to extend its regulation to all cases which it might possibly reach. The Legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' If 'the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might

have been applied.' " *West Coast Hotel Co. v. Parrish*, 300 *U. S.* 379, 57 *S. Ct.* 578, 585, 81 *L. Ed.* 703 (1937). [*Board of Health, Weehawken Tp. v. N. Y. Central R. Co.*, 4 *N. J.* 293, 302 (1950).]

The Legislature determined that railroads are entitled to be secured from negligence suits involving actions by plaintiffs who have contributed to their own injuries in the manner enumerated. While the court doubts the need for such legislation in light of our State's relevant case law, already noted, it cannot say there is no rational basis for the Legislature's enactment of *N. J. S. A.* 48:12–152 and its distinctive classification of railroads, a classification designed to help insure the continued operation of this type of transportation and to discourage individuals from engaging in conduct of a nature dangerous to themselves.

██ The court is well aware that "care must be exercised that the efficacy of constitutional guarantees shall not be whittled away by indulging in unwarranted presumptions of a factual basis for the legislation." *Sarner v. Union Tp.*, 55 *N. J. Super.* 523, 533–534 (Law Div. 1959). The classification in the instant case, however, bears a reasonable and just relation to a substantial consideration of public policy. This consideration, particularly in light of the state of our decisional law with regard to the contributory negligence of those jumping onto or off of moving passenger trains, outweighs any incidental injury to individuals whose litigations might be affected by it. *Washington National Ins. Co. v. Board of Review*, 1 *N. J.* 545, 552 (1949) ; *Robinson v. Cahill, supra.* Further, it would appear to this court at least that persons injured while voluntarily jumping onto or off of moving buses or aircraft would be contributorily negligent in a mode similar to that provided by our case law for railroad passengers. *Cf. Massotto v. Public Service Coord. Transport,* 71 *N. J. Super.* 39, 45 (App. Div. 1961).

The burden of demonstrating that a statute contravenes the equal protection clause is extremely formidable, as is attested by the long trail of failure. In addition to the strong presumption of constitutionality with which all organic challenges are approached, one who as-

sails a statute on this ground must contend with principles of unusual elasticity. It is easily stated that the classification (1) must not be palpably arbitrary or capricious, and (2) must have a rational basis in relation to the specific objective of the legislation. But the second proposition is qualified by limitations which compound the difficulties of one who assails the legislative decision. Thus it is not enough to demonstrate that the legislature's objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. * * * The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and expense, * * *, or because of "some substantial consideration of public policy or convenience or the service of the general welfare." [*N. J. Restaurant Ass'n. Inc. v. Holderman*, 24 *N. J.* 295, 300 (1957)]

See also, *Two Guys From Harrison, Inc. v. Furman*, 32 *N. J.* 199, 218 (1960); *Gilman v. Newark*, 73 *N. J. Super.* 562 (Law Div. 1962); *Zullo v. Bd. of Health, Woodbridge Tp.*, 9 *N. J.* 431, 439–440 (1952); *State v. Garford Trucking, Inc.*, 4 *N. J.* 346, 355–356 (1950); *Wilson v. Long Branch*, 27 *N. J.* 360 (1958).

Plaintiffs have failed to carry the burden of showing *N. J. S. A.* 48:12–152 is violative of the concept of equal protection.

Plaintiffs also contend that *N. J. S. A.* 48:12–152 is a special, private or local law in violation of *N. J. Const.* (1947), Art. IV, § VII, pars. 7, 8, 9(8). To put it another way plaintiffs contend the statutory provisions in question are not "general" in character. "* * * In the constitutional sense, every law is either general or special." *Vail Mutual Ass'n v. Speaker of House*, 107 *N. J. Super.* 517, 530 (App. Div. 1969).

A law is "general" (1) if the class of subjects established, recognized or regulated is distinguished by characteristics sufficiently marked and important to make it a class by itself, and (2) if it encompasses all of the subjects which reasonably belong within the classification, and does not exclude any which naturally belong therein. A law is private, special or local if it arbitrarily or unnaturally excludes any subject which should be included. *Harvey v. Essex County Board of Freeholders*, 30 *N. J.* 381, 389 (1959). [*Roe v. Kervick*, 42 *N. J.* 191, 233 (1964)]

180

In deciding whether an act is general or special, it is what is excluded that is the determining factor and not what is included. *Budd v. Hancock*, 66 *N. J. L.* 133, 135–136 (Sup. Ct. 1901). If no one is excluded who should be encompassed, the law is general. Another requirement of a general law is that it must affect equally all of a group who, bearing in mind the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves. In *Van Riper v. Parsons*, 40 *N. J. L.* 1, 9 (Sup. Ct. 1878) the court pointed out that local and special laws rest on a false or deficient classification in that "their vice is that they do not embrace all the class to which they are naturally related; they create preference and establish inequalities; they apply to persons, things or places possessed of certain qualities or situations, and exclude from their effect other persons, things or places which are not dissimilar in those respects." [Citations omitted]. With this distinction between a special and a general law in mind, the question is whether any appropriate person is excluded to which the law, but for its limitations, would apply. * * * [Citations omitted].

\* \* \* \* \* \* \* \*

It is well established that the Legislature has a wide range of discretion in determining classifications and distinctions will be presumed to rest upon a rational basis "if there be any conceivable state of facts which would afford reasonable support for them." *Wilson v. City of Long Branch*, 27 *N. J.* 360, 377 (1958). * * * [*Harvey v. Essex County Board of Chosen Freeholders, supra.* 30 *N. J.* at 389–390]

See also, *Vail Mutual Ass'n v. Speaker of House, supra.; In re Freygang*, 46 *N. J. Super.* 14, 22–27 (App. Div. 1957), aff'd 25 *N. J.* 357 (1957); *Koons v. Board of Commissioners, Atlantic City*, 134 *N. J. L.* 329, 332–333 (Sup. Ct. 1946), aff'd o.b. 135 *N. J. L.* 204 (E. & A 1947); *Mason v. Paterson*, 120 *N. J. Super.* 184 (Law Div. 1972).

 The court believes that with regard to the determination of whether a statute is general or special "the reasonableness of a classification must be judged in the light of the legislative objective," *Kline v. N. J. Racing Comm'n*, 38 *N. J.* 109, 118 (1962), and that the analysis already engaged in by us in the context of equal protection is generally dispositive of plaintiffs' arguments with regard to their contention that *N. J. S. A.* 48:12–152 is a special law, *Meadowlands Regional Development Agency v. State*, 112

*N. J. Super.* 89, 101–102 (Ch. Div. 1970); *Rosenberg v. North Bergen*, 61 *N. J.* 190, 201 (1972); *Alfred Vail Mutual Ass'n v. Shrewsbury, supra*, 58 *N. J.* at 52; Robson *v. Rodriguez, supra*, 26 *N. J.* at 526; *General Public Loan Corp. v. Director, Div. of Taxation*, 13 *N. J.* 393, 401 (1953); *Robinson v. Cahill, supra*, 119 *N. J. Super.* at 48–49, and hence void.

Plaintiffs have failed to carry their burden of proving this statute unconstitutional. The Legislature has found "that adequate commuter and passenger railroad service is essential to the welfare of the State and constitutes, on a comparative basis, the most efficient means for the movement of people during the rush hour. (*L.* 1959, *c.* 14, § 1)." *Bayonne v. Palmer*, 90 *N. J. Super.* 245, 261 (Ch. Div. 1966), aff'd 47 *N J.* 520 (1966). See also *Wilson v. Long Branch, supra*, 27 *N. J.* at 377–378. The Legislature enacted this statute both to attempt to insure the continuing economic viability of this form of transportation (the current financial position of defendant is a good example of how tenuous the situation in this regard currently is) and to attempt to deter certain forms of dangerous conduct on its trains. While this court may question the need for such legislation in the light of our existing principles of negligence law (see, for example, *Powell v. Erie R. R. Co.*, 70 *N. J. L.* 290, 293 (E. & A. 1903), where the court seemed to express doubt as to any need for statutory support for the proposition "that a person injured while jumping on or off a train in motion is guilty of contributory negligence"), "the courts will not pass judgment upon the wisdom of the Legislature in enacting a law, but will only ascertain if the Legislature has kept within its powers. *State v. Garden State Racing Ass'n*, 136 *N. J. L.* 173 (E. & A. 1947)." *Sarner v. Union Tp., supra*, 55 *N. J. Super.* at 533; *Brown v. Heymann, supra*, 62 *N. J.* 10–11; *Texas Co. v. Di Gaetano, supra*, 71 *N. J. Super.* at 431.

The court is mindful that "legislative inaction can mean only that the Legislature did not act," and is not dispositive of the question of intent when a statute was originally passed, which "is a judicial question as to which neither the action nor inaction of a subsequent Legislature can be dispositive," *Schmoll v. Creecy*, 54 *N. J.* 194, 203 (1969), but where the constitutional validity of a statutory provision is challenged "it is the policy of our law not to invalidate a statute which has been in force without substantial change for many years, unless its unconstitutionality is obvious." *Williams v. Smith*, 94 *N. J. Super.* 341, 346 (App. Div. 1967), aff'd 51 *N. J.* 161 (1967). We can feel certain sympathy for plaintiffs who may be barred by the statute from any compensation for their injury, a sympathy which may be evoked whenever a defense of contributory negligence is successful. Yet other legitimate public interests are furthered by this statute and "the assumed injury to the individual is presumed to be offset by the benefit accruing to him as one of the public at large. *Earruso v. Board of Health, East Hanover*, 120 *N. J. L.* 463 (Sup. Ct. 1938)." *Lincoln Park v. Cullari*, 15 *N. J. Super.* 210, 215 (App. Div. 1951).

To repeat, the determination of what constitutes a valid public purpose and the selection of the means to achieve that purpose are matters peculiarly within the judgment of the Legislature. The legislative decision * * * that the purpose to be served by a particular enactment is a valid public purpose is a conclusion entitled to great weight by the courts. It should not be set aside unless there is no reasonable basis for sustaining it.

* * *

It must be remembered that the greatest danger to people from the exercise of the judicial power is that there may be a usurpation by the courts of the people's right to express in law * * * their collective reasoning. Rights are fragile. A personal determination cannot be substituted for the law because it accords with a judge's own feelings or pleases a special interest group at the moment. Our obligation is to dispassionately apply the people's will, as expressed through the democratic process consisting of the legislative vote. The law when enacted must be constitutional, [and remains so]. [*N. J. Sports & Exposition Authority v. McCrane, supra*, 119 *N. J. Super.* at 476–477]

Plaintiffs' motions to strike the enumerated affirmative defenses are denied. Plaintiffs' motions in the alternative for summary judgment are also denied, for there are genuine issues of material fact, particularly with regard to the issue of contributory negligence, still requiring disposition at trial. *Judson v. People's Bank & Trust Co. of Westfield,* 17 N. J. 67, 73 (1954).